IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MARGUERITE E. HIPWELL,<br><br>    Plaintiff,<br><br>v.<br><br>AIR & LIQUID SYSTEMS CORP. et al.,<br><br>    Defendants. | **MEMORANDUM DECISION AND ORDER DENYING FOSTER WHEELER'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:20-cv-00063-JNP-JCB<br><br>District Judge Jill N. Parrish |

Marguerite E. Hipwell ("Hipwell"), individually and as General Personal Representative of the Estate of Keith W. Hipwell ("Mr. Hipwell" or "the decedent"), sued Foster Wheeler Energy Corp. ("Foster Wheeler") and numerous other defendants for negligence, failure to warn, and various other claims. ECF No. 98. Before the court is Foster Wheeler's motion for summary judgment. ECF No. 183. For the reasons presented herein, the court DENIES Foster Wheeler's motion for summary judgment.

## BACKGROUND[1]

From 1951 to 1953, Mr. Hipwell served in the United States Navy as a boiler tender on the U.S.S. *Foss*. As a boiler tender, Mr. Hipwell was responsible for operating and maintaining the two boilers on the ship, which were manufactured by Foster Wheeler. The Foster Wheeler boilers contained approximately 250 pounds of asbestos, and Foster Wheeler specified that asbestos millboard, asbestos rope, folded woven asbestos tape, and asbestos gaskets be used in the boilers. Even though Foster Wheeler was aware of the health hazards associated with exposure to asbestos

---

[1] The court recites the facts in the light most favorable to the nonmoving party, Hipwell.

at this time, Foster Wheeler did not provide any warnings regarding the hazards of asbestos either on the boilers themselves or in the written materials that accompanied the boilers. The Navy similarly did not warn Mr. Hipwell regarding the dangers of asbestos. As a result, while serving on the U.S.S. *Foss*, Mr. Hipwell did not know that asbestos could be hazardous to his health, and he did not take precautions, such as wearing a mask or a respirator, to prevent exposure to asbestos.

Consequently, while performing his job responsibilities, Mr. Hipwell inhaled asbestos dust. For instance, on occasion, Mr. Hipwell was required to clean out the boilers' fireboxes. Mr. Hipwell would enter the boilers' fireboxes through an access door surrounded by asbestos-containing materials and then, once inside, he would "scrape the tubes in the firebox" and replace "clay mixed with asbestos" that was on the walls of the firebox. *See* ECF No. 202-3 at 14:19–15:9. To perform this work, Mr. Hipwell would use "chisels, hammers, and stuff like that," which would cause "foreign objects" and "dust to get in the air," which Mr. Hipwell breathed. *See id.* at 16:21–17:5. In addition, when the U.S.S. *Foss* was in dry dock in Long Beach, California, for a six-week period, Mr. Hipwell took turns standing fire watch as shipyard workers overhauled and replaced bad tubes in the boiler. While standing fire watch, Mr. Hipwell was positioned no more than about 25 feet from the boilers and inhaled the dust that the shipyard workers' labor produced.

On January 3, 2020, Mr. Hipwell died from mesothelioma. Hipwell subsequently sued numerous defendants, including Foster Wheeler, for negligence and failure to warn about the hazards of asbestos, among other claims. Foster Wheeler now moves for summary judgment on all of Hipwell's claims against it.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "A dispute over a material fact is genuine if a rational [fact-finder] could find in favor of the nonmoving party on the evidence presented." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (citation omitted).

"At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). Rather, the court must "construe the evidence in the light most favorable to . . . the nonmoving party." *Est. of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (citation omitted). However, summary judgment on a claim is required if the party that bears the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

## ANALYSIS

Foster Wheeler argues that it is entitled to summary judgment on all of Hipwell's claims against it. Specifically, Foster Wheeler asserts that Hipwell's claims against it fail as a matter of law because (1) "there is no evidence that Mr. Hipwell was frequently or regularly exposed to any asbestos-containing products associated with Foster Wheeler boilers"; (2) Hipwell "cannot meet her burden to establish that Foster Wheeler owed Mr. Hipwell a duty to warn him of any hazards associated with any asbestos-containing products associated with its equipment"; (3) Hipwell's claims are "barred by the Government Contractor Defense"; and (4) "there is no factual basis to conclude, or reasonably infer, that any warning Foster Wheeler might have placed on its equipment

3

would have altered Mr. Hipwell's conduct or prevented his injuries." ECF No. 183 at 1–2. The court addresses the parties' arguments regarding each issue in turn.

## I.   Whether Foster Wheeler's Asbestos-Containing Equipment was a Substantial Factor in Causing the Decedent's Injury

Foster Wheeler argues that it is entitled to summary judgment on all of Hipwell's claims against it because "[t]here is simply no evidence of substantial exposure to asbestos associated with any Foster Wheeler equipment in this case." ECF No. 183 at 14. Specifically, Foster Wheeler contends that "[m]aritime law dictates that a plaintiff must demonstrate substantial-factor causation before a defendant can be held liable for the plaintiff's injuries."[2] *Id.* at 12. According to Foster Wheeler, substantial-factor causation can be established if the plaintiff "demonstrat[es] that

---

[2] Both parties appear to assume that maritime law applies to Hipwell's claims against Foster Wheeler. "In order for maritime law to apply, a plaintiff's exposure underlying a products liability claim must meet both a locality test and a connection test." *Reynolds v. Gen. Elec. Co.*, No. 5:09-CV-80025-ER, 2012 U.S. Dist. LEXIS 65149, at *6 (E.D. Pa. Mar. 30, 2012). "The locality test requires that the tort occur on navigable waters or, for injuries suffered on land, that the injury be caused by a vessel on navigable waters. In assessing whether work was on 'navigable waters' (i.e., was sea-based) it is important to note that work performed aboard a ship that is docked at the shipyard is sea-based work, performed on navigable waters." *Id.* (internal citation omitted) (citing *Sisson v. Ruby*, 497 U.S. 358 (1990)). "The connection test requires that the 'type of incident involved' have 'a potentially disruptive impact on maritime commerce,' and that 'the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.'" *Dumas v. ABB Grp., Inc.*, 46 F. Supp. 3d 477, 482 (D. Del. 2014) (cleaned up) (quoting *Jerome B. Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995)). "However, where a worker whose claims meet the locality test was primarily sea-based during the asbestos exposure, those claims will almost always meet the connection test necessary for application of maritime law. 'This is particularly true in cases in which the exposure has arisen as a result of work aboard Navy vessels, either by Navy personnel or shipyard workers.'" *Id.* (internal citations omitted). Here, the decedent's alleged exposure to asbestos associated with Foster Wheeler's equipment occurred while the decedent served as a boiler tender for the United States Navy. Hipwell alleges that the decedent's exposure occurred while the decedent maintained Foster Wheeler boilers on the high seas and stood fire watch when the U.S.S. *Foss* was overhauled while drydocked in Long Beach, California. Accordingly, the court concludes that the decedent's alleged exposure to asbestos associated with Foster Wheeler's equipment meets both the locality test and the connection test and, therefore, that Hipwell's claims against Foster Wheeler are governed by maritime law.

the injured person had substantial exposure to the relevant asbestos-containing product for a substantial period of time." *Id.* at 12–13. Foster Wheeler asserts that here, though, there is no evidence that the decedent had "frequent or regular exposure to any asbestos-containing products associated with Foster Wheeler boilers." *Id.* at 13. Indeed, according to Foster Wheeler, the decedent's shipmate, Dean Burch, "did not identify any exposure to asbestos associated with Foster Wheeler boilers, other than the replacement of plastic modeling clay." *Id.* Moreover, according to Foster Wheeler, testimony from Richard Johnson, former chief ceramic engineer for Foster Wheeler, "confirmed that the modeling clay used on the Foster Wheeler boilers did not contain asbestos and, even if it did, the asbestos would have been 'obliterated' by the 3,000°F temperatures inside of the boiler." *Id.* Foster Wheeler further contends that Hipwell's expert witness does not suggest otherwise, since he could not say whether the clay and firebrick about which Burch testified contained asbestos. Foster Wheeler asserts that, consequently, in the absence of any evidence that the decedent was exposed to asbestos associated with its boilers, summary judgment in its favor is warranted.

Hipwell responds that the decedent's exposure to asbestos associated with Foster Wheeler's boilers, as detailed in Burch's testimony, was "a substantial factor in [his] development of mesothelioma and subsequent death." ECF No. 202 at 20. Hipwell contends that a substantial factor "need only increase the risk of harm," *id.* at 19–20 (citation omitted), and that "[t]he question of '[w]hether the defendant's conduct was a substantial factor is a question for the jury, unless the court determines that reasonable men could not differ,'" *id.* at 17 (quoting *Borel v. Fibreboard*, 493 F.2d 1076, 1094 (5th Cir. 1973)).

"In order to establish causation for an asbestos claim under maritime law, a plaintiff must show, for each defendant, that '(1) he was exposed to the defendant's product, and (2) the product

was a substantial factor in causing the injury he suffered.'" *Nelson v. A.W. Chesterton Co.*, No. 2:10-cv-69365, 2011 U.S. Dist. LEXIS 142969, at *12 (E.D. Pa. Oct. 27, 2011) (quoting *Lindstrom v. A-C Prod. Liab. Tr.*, 424 F.3d 488, 492 (6th Cir. 2005)). "[A] party may satisfy the substantial-factor test by demonstrating that the injured person had substantial exposure to the relevant asbestos for a substantial period of time." *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1176 (9th Cir. 2016). Accordingly, "[e]vidence of only minimal exposure to asbestos is insufficient; there must be 'a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural.'" *Id.* (citation omitted); *see also Gay v. A.O. Smith Corp.*, No. 2:19-cv-1311, 2021 U.S. Dist. LEXIS 120300, at *72–73 (W.D. Pa. June 17, 2021) ("A demonstration of 'minimal exposure' to a defendant's product is not sufficient. Rather, the plaintiff must show 'substantial exposure' to allow a reasonable inference—based on more than conjecture—that the defendant's product was a substantial factor in causing the plaintiff[']s injury." (internal citation omitted)). That said, "[t]he question of 'substantiality' is one of degree normally best left to the fact-finder." *Gay*, 2021 U.S. Dist. LEXIS 120300, at *73 (citation omitted).

Here, Hipwell has presented sufficient evidence that the asbestos associated with Foster Wheeler's boilers was a substantial factor in causing the decedent's alleged injuries. Specifically, the decedent worked as a boiler tender on the U.S.S. *Foss* from 1951 to 1953. On the U.S.S. *Foss*, the decedent operated and maintained two Foster Wheeler boilers, *see* ECF No. 202-3 at 12:4–21, each of which contained approximately 250 pounds of asbestos, *see* ECF No. 202-10 at 90:19–22. Dean Burch, with whom the decedent worked on the U.S.S. *Foss*, *see* ECF No. 202-3 at 10:5–8, 11:2–13, 12:4–12, testified that, as part of this work, he and the decedent occasionally had to enter the boilers, *see id.* at 16:6–20. Hipwell has produced evidence that the access doors through which

6

the decedent would have entered the boilers were surrounded by asbestos-containing materials. *See* ECF No. 202-4 at 39:8–21 ("And would there be any asbestos around that access door? A[.] Yes. It could have been asbestos-containing insulation behind the insulation on the door. The arrows on an open door, that white area is probably refractory backed up by asbestos-containing insulation. . . . Q[.] Would there be any gaskets or rope on that door? A[.] Yes, sir. There had to be a seal on the door. And that was usually a woven encapsulated asbestos tape."). Burch testified that, once inside the boilers, he and the decedent would "have to clean out in the firebox, we'd have to scrape the tubes in the firebox." ECF No. 202-3 at 14:23–25. Burch further testified that "[t]here was a clay of some sort . . . and sometimes we'd have to replace this clay mixed with asbestos. We'd have to put it on the walls of the firebox in there. And over a period of years and time, after use, it would break down, and we'd have to replace that." *Id.* at 15:1–6. Burch testified that when he and the decedent performed this work, they used "chisels, hammers, and stuff like that," which caused dust to get into the air, which both men breathed. *Id.* at 16:21–17:5. Burch recalled that they performed such work "three or four times" while they were aboard the U.S.S. *Foss*. *Id.* at 17:6–15.

Similarly, Burch testified that, at times, he and the decedent "would have to open the boilers up and the steam drum and the mud drums." *Id.* at 14:21-23. Foster Wheeler's corporate representative, Thomas Schroppe, testified that "the manway going into the steam drum" likely contained asbestos gaskets. *See* ECF No. 202-8 at 76:3–11 ("[Q.] Were there any component parts of the Foster Wheeler boilers on the USS Foss that were asbestos-containing? A. There were more than likely asbestos gaskets on the Foss. And these would have been in the manway going into the steam drum and water drum and the water wall headers, and the superheater headers.").

Burch also testified that while he and the decedent were on the U.S.S. *Foss*, the ship underwent a six-week overhaul while it was drydocked in Long Beach, California. According to Burch's testimony, as part of this overhaul, "people from the shipyard worked down in [the boiler room], welding, cutting it up, putting new equipment in, stuff like that, working on the boilers." ECF No. 202-3 at 24:21–25:1. Specifically, shipyard workers "replaced some of the tubes in the boiler because they [were] getting bad[] [a]nd you had to have special tools to put new tubes in the boiler." *Id.* at 27:5–10. Although neither Burch nor the decedent actually assisted with the overhaul of the boilers, they took turns standing fire watch, charged with "put[ting] it out or alarm[ing] somebody" if there was a fire. *Id.* at 25:11–18. Burch testified that, while standing fire watch, he and the decedent were no more than approximately 25 feet away from the workers and the boilers and that he was "pretty sure" that they both inhaled dust that was created by the work on the boilers. *Id.* at 26:24–28:1.

To be sure, Foster Wheeler's evidence that the decedent was not exposed to asbestos associated with its boilers—particularly Johnson's testimony that he "never saw either [the firebrick or clay] with any asbestos in it" and, even "[i]f there was any asbestos in the clay, it would [have been] immediately obliterated when it was heated," *see* ECF No. 183-3 at 52:16–53:6— undercuts Burch's testimony, as does Hipwell's expert's equivocations, *see* ECF No. 204-1 at 35:11–17 ("Q. Have you seen any evidence that the clay and firebrick that Mr. Burch testified about did contain asbestos? A. Not the specific clay and firebrick, no. I have seen no testing of that material that was put in Foster Wheeler boilers because I don't know if Foster Wheeler ever tested that."). However, at the summary judgment stage, "the judge's function is not to weigh the evidence and determine the truth of the matter." *Concrete Works*, 36 F.3d at 1518. Rather, the court must "construe the evidence in the light most favorable to" Hipwell, as the nonmoving party. *See*

*Est. of Booker*, 745 F.3d at 411. Accordingly, the court concludes that Hipwell has presented sufficient—albeit relatively weak—evidence that the decedent was exposed to asbestos associated with Foster Wheeler's boilers while working on the U.S.S. *Foss*, and the court declines to take from the jury the question of whether the decedent's exposure was sufficiently substantial to hold Foster Wheeler liable for his alleged injuries. *See Gay*, 2021 U.S. Dist. LEXIS 120300, at *72–73 (citation omitted).

## II.     Whether Foster Wheeler Had a Duty to Warn the Decedent

Foster Wheeler asserts that it is entitled to summary judgment because, under the standard articulated by the United States Supreme Court in *Air & Liquid Systems Corp. v. DeVries*, 139 S. Ct. 986 (2019), Foster Wheeler had no duty to warn the decedent regarding the dangers of asbestos. Specifically, in *DeVries*, the Supreme Court clarified that

> [i]n the maritime tort context, a product manufacturer has a duty to warn when (i) its product requires incorporation of a part, (ii) the manufacturer knows or has reason to know that the integrated product is likely to be dangerous for its intended uses, and (iii) the manufacturer has no reason to believe that the product's users will realize that danger.

*Id.* at 991. According to Foster Wheeler, Hipwell cannot establish any of those factors and, therefore, her claims against it fail as a matter of law. The court addresses each factor in turn and concludes that Hipwell has presented sufficient evidence that Foster Wheeler had a duty to warn the decedent regarding the dangers of the asbestos associated with its boilers.

### A.     Whether Foster Wheeler's Boilers Required Incorporation of Asbestos

In *DeVries*, the Supreme Court clarified that a product requires incorporation of a part when "(i) a manufacturer directs that the part be incorporated; (ii) a manufacturer itself makes the product with a part that the manufacturer knows will require replacement with a similar part; or (iii) a product would be useless without the part." *Id.* at 995–96 (internal citations omitted).

Because the court determines that, when viewed in the light most favorable to Hipwell, *see Est. of Booker*, 745 F.3d at 411, there is evidence that Foster Wheeler directed that asbestos be incorporated into its boilers, the court limits its discussion to that situation.

Foster Wheeler contends that "the evidence shows that Foster Wheeler did not specify or direct the use of asbestos-containing replacement third-party products for its equipment aboard the *USS Foss*." ECF No. 183 at 17. According to Foster Wheeler, "[i]t cannot reasonably be disputed that the choice to use asbestos-containing replacement third-party products was made by the Navy and based on its own MilSpecs and Qualified Product Lists that were in effect as of the date of the original installation of the equipment by the shipyard, and the dates of any subsequent maintenance and repair work." *Id.* In response, Hipwell asserts that "Foster Wheeler Bills of Materials and Production Lists call[ed] for the relevant boilers [] to include asbestos rope packing, asbestos tape, asbestos millboard and asbestos gaskets, and other Foster Wheeler documents instruct the use of insulation which Foster-Wheeler [sic] admits contained asbestos." ECF No. 202 at 22. According to Hipwell, "Foster Wheeler thus directed that the asbestos parts should be incorporated." *Id.* The court agrees.

Specifically, Hipwell has produced a number of documents that, when viewed in the light most favorable to her, lead to the reasonable inference that Foster Wheeler directed that asbestos be incorporated into its boilers on the U.S.S. *Foss*. For instance, Hipwell produced a Marine Steam Generator Proposal for Escort Vessels dated March 27, 1942. *See* ECF No. 202-28 at 4. In the proposal, Foster Wheeler specified the use of asbestos millboard. *Id.* at 13. A reasonable inference is that the proposal applied to the boilers on the U.S.S. *Foss* because the U.S.S. *Foss* was a destroyer escort, ECF No. 202-3 at 11:14–15, and "[t]he two boilers on the *USS Foss* were manufactured by Foster Wheeler and installed in 1943, when the ship was built," ECF No. 183 at

10

3. Similarly, Hipwell produced a Bill of Material and Production List for "U.S. Navy Escort Vessel" from 1942, which called for asbestos rope packing, ECF No. 202-30 at 3, 4, 8, 9, 13, folded woven asbestos tape, *id.* at 5, 6, 10, 11, asbestos rope, *id.* at 6, 11, asbestos millboard, *id.* at 7, 12, and asbestos gasket, *id.* at 14, 15. Moreover, Hipwell has produced evidence that, until at least 1971, Foster Wheeler internally specified asbestos for use in block insulations. *See* ECF No. 202-12 at 132:4–133:10.

Accordingly, there is evidence that Foster Wheeler directed and specified that asbestos be incorporated into the boilers on the U.S.S. *Foss*. Indeed, even if the Navy specified that asbestos should be used in the boilers, that does not necessarily mean that Foster Wheeler did not simultaneously direct that asbestos be used in its boilers. In other words, Foster Wheeler's direction that asbestos be used in its boilers could have simply been consistent with the Navy's specifications. *See Dennis v. Air & Liquid Sys. Corp.*, No. CV 19-9343-GW-KSx, 2021 U.S. Dist. LEXIS 182133, at \*27 (C.D. Cal. Mar. 24, 2021) ("The Court observes that even assuming that later Navy specifications required the use of asbestos parts, it is not clear that it would automatically eliminate ViacomCBS's duty to warn. After all, it would be a strange result if ViacomCBS could eliminate its duty to warn about the danger of asbestos parts it included in its designs because the Navy – following ViacomCBS's lead in ViacomCBS's design choice to incorporate asbestos parts in the first place – required them in its specifications."). In fact, Hipwell has produced evidence that, in an instruction book directed at commercial ships, Foster Wheeler stated that Foster Wheeler boiler insulation "should be thoroughly examined and replaced with asbestos rope of approved size where necessary, and asbestos cement as specified." ECF No. 202-19 at 34. This is evidence that Foster Wheeler "'required the use of asbestos' (for the purposes of *DeVries*) independent of the Navy specifications." *See Dennis*, 2021 U.S. Dist. LEXIS 182133, at

*28–29. Therefore, the court concludes that there is a triable issue of fact regarding whether Foster Wheeler directed that asbestos be incorporated into its boilers on the U.S.S. *Foss*.[3]

B.     *Whether Foster Wheeler Knew or Had Reason to Know that Their Asbestos-Containing Boilers Were Likely to Be Dangerous for Their Intended Uses*

Under *DeVries*, a product manufacturer only has a duty to warn if "the manufacturer knows or has reason to know that the integrated product is likely to be dangerous for its intended uses." 139 S. Ct. at 991. Foster Wheeler asserts that the evidence that it has produced "establishes that at all times relevant to this case it was the universal belief – both inside and outside the Navy – that the use of asbestos-containing gaskets with shipboard equipment did *not* pose a risk of harm to those handling such equipment." ECF No. 183 at 19. Therefore, according to Foster Wheeler, Hipwell's claims "fail as a matter of law because there is no proof that Foster Wheeler, or indeed the industrial health field in general, knew or should have known that incorporation of asbestos-containing third-party replacement products with Foster Wheeler's equipment would pose a health risk when used as intended." *Id.* Hipwell responds that "Foster Wheeler knew about the hazards of asbestos as early as the 1930[s], which was almost twenty (20) years before Mr. Hipwell was working on the USS Foss. However, regardless of when Foster Wheeler actually became aware of the hazards of asbestos, it had 'reason to know' that asbestos dust was harmful in the 1930s." ECF

---

[3] Foster Wheeler cites *Phelps v. CBS Corp.*, No. 17-cv-8361 (AJN), 2021 WL 4226037 (S.D.N.Y. Sept. 16, 2021) and *DeVries v. General Electric Co.*, 547 F. Supp. 3d 491 (E.D. Pa. 2021) as cases in which the court determined that the plaintiffs failed to demonstrate that the defendants directed that asbestos be incorporated into their products. However, whereas Hipwell has produced evidence that Foster Wheeler directed that asbestos be incorporated into its boilers on the U.S.S. *Foss*—as detailed in the main text—in *Phelps*, the court determined that the plaintiff "provide[d] no evidence that Foster Wheeler directed the use of asbestos," 2021 WL 4226037, at *5, and in *DeVries*, the court concluded that the "[p]laintiffs produced no relevant evidence that GE and CBS specified or directed the incorporation of asbestos insulation with the type of naval turbines used on the Turner," 547 F. Supp. 3d at 495. Therefore, Hipwell has produced evidence that the courts in those other cases concluded was lacking.

No. 202 at 23. The court concludes that there is a genuine dispute regarding whether Foster Wheeler knew or had reason to know that the boilers were likely to be dangerous for their intended uses.

Specifically, Hipwell has produced evidence that, as early as the 1930s, Foster Wheeler was aware of the health hazards associated with exposure to asbestos. *See* ECF No. 202-6 at 192:03–10, 195:12–16. Moreover, Hipwell has produced evidence that Foster Wheeler was a member of the National Safety Council, *see* ECF No. 202-17 at 29, and that "[b]y the 1930s, members of the National Safety Council were informed that asbestos dust was an industrial hazard and that inhalation of asbestos dust caused severe disease, disability and death," ECF No. 202-18 at 17. Members were also informed "that proper industrial hygiene controls included wet down procedures and ventilation, and, as a last resort, respiratory protection was recommended for workers." *Id.* In addition, Hipwell has produced an article from the November 1946 issue of "Southern Power and Industry"—a publication in which Foster Wheeler had previously advertised—in which the author discussed the harms associated with the inhalation of asbestos dust. *See* ECF No. 202-24 at 3–4, 7, 10–11. Accordingly, a reasonable inference to be drawn from this evidence is that, at a minimum, Foster Wheeler had reason to know that its asbestos-containing boilers were likely to be dangerous for their intended uses. *See Dennis*, 2021 U.S. Dist. LEXIS 182133, at *38 ("Given the professional and academic literature highlighting the danger of asbestos exposure – even when limited to activities such as gaskets – there is a triable issue of fact as to whether the defendants had reason to know about the danger their products posed and therefore owed sailors a duty to warn.").

To be sure, Foster Wheeler's evidence that the "Navy regarded gaskets and packing as negligible sources of asbestos exposure," ECF No. 183-9 ¶ 69; *see also* ECF No. 183-20 ¶ 4,

support its contention that it neither knew nor had reason to know that its boilers, with asbestos materials incorporated into them, were likely to be dangerous for their intended uses. However, the conflicting evidence presented by Hipwell and Foster Wheeler simply highlights that there is a genuine dispute of fact that would be inappropriate for the court to resolve on summary judgment.

C.    *Whether Foster Wheeler Had No Reason to Believe that the Boilers' Users Would Realize the Danger*

To establish that the product manufacturer had a duty to warn under *DeVries*, a plaintiff must also demonstrate that "the manufacturer ha[d] no reason to believe that the product's users [would] realize [the] danger" associated with using the product. *See* 139 S. Ct. at 991.[4] Foster Wheeler argues that "[f]ar from showing that Foster Wheeler had 'no reason to believe' that Mr. Hipwell and similarly-situated sailors in the 1950s would be aware of any possible hazards associated with the shipboard use of asbestos-containing materials, the evidence shows that years before Mr. Hipwell ever set foot on the *USS Foss*[] the Navy already had an asbestos safety program in place that became even more robust during his tenure." ECF No. 183 at 19. Foster Wheeler contends that the Navy implemented "specific work practices (including segregation, special ventilation, the use of respirators and periodic medical examinations) to avoid excessive asbestos exposure on Navy ships" and that "[t]hese measures necessarily required that the Navy inform sailors, such as Mr. Hipwell, of the dangers of excessive exposure" to asbestos. *Id.* at 20.

---

[4] As a preliminary matter, the court agrees with other district courts that the "product's *user*" in a case such as the one here is the individual Navy sailors and personnel who actually *used* the product, rather than the Navy itself. *See Dennis*, 2021 U.S. Dist. LEXIS 182133, at *36. Indeed, "the underlying principle in *DeVries* for imposing a duty to warn was maritime law's 'special solicitude for the welfare of those who undertake to venture upon hazardous and unpredictable sea voyages.' . . . It would not be that solicitous of sailors to allow a manufacturer who skip warnings on the assumption that an intermediary (*e.g.*, a shipowner, shipbuilder, or here, the Navy) would properly warn the sailors about them." *Id.* (quoting *DeVries*, 139 S. Ct. at 995). Therefore, the relevant inquiry is whether Foster Wheeler had no reason to believe that Navy boiler tenders, such as the decedent, would realize the danger associated with its asbestos-containing boilers.

Thus, according to Foster Wheeler, it had reason to believe that sailors, such as the decedent, would realize the dangers associated with using its boilers.

Hipwell responds that "there is no evidence that Mr. Hipwell was aware of the hazards in the 1950[s], nor any evidence that Foster Wheeler had reason to believe that the users of its products would be aware of the hazards." ECF No. 202 at 23. In particular, Hipwell points to Burch's testimony that "there were no warnings about the health effects of exposure to asbestos on Foster-Wheeler's [sic] boilers" and Foster Wheeler's evidence that even "the Navy was not fully cognizant of the asbestos insulation hazard and had no awareness of the gasket and packing hazard." *Id.* at 23–25. The court concludes that there is a genuine dispute of material fact.

First, Foster Wheeler's own evidence suggests that the Navy did not fully realize the dangers associated with using Foster Wheeler's asbestos-containing boilers. *See* ECF No. 183-20 ¶ 4 ("All of the asbestos in these [packing and gasket materials] is fabricated as cloth, rope, or compressed sheet with binders, so that the items are not friable when they are cut. Thus, these items do not cause dust in shipboard applications. In addition, in many instances, they are received already incorporated in the finished assembly, such as a valve, and do not require fabrication by the shipyard. For these reasons, packings and gaskets containing asbestos are not considered to be a significant health hazard."); ECF No. 183-9 ¶ 69 ("[T]he Navy regarded gaskets and packing as negligible sources of asbestos exposure."). Thus, a reasonable inference is that individual Navy sailors, such as the decedent, likewise did not realize the dangers associated with using the boilers.

That inference is further supported by the testimony from Burch—the decedent's former fellow boiler tender—who testified that he never saw any signs on the Foster Wheeler boilers warning about the hazards of asbestos, was never told to wear a mask or respirator when working with asbestos dust, and had no idea that asbestos could be hazardous to his health while working

on the U.S.S. *Foss*. *See* ECF No. 202-3 at 24:2–10 ("Q. At any of the times that you were in – working in the boiler room, did you ever see any warning signs on any of the Foster Wheeler boilers warning you of the hazards of asbestos? A. I had never seen any signs like that. No. Q. Did you see any signs on any of the equipment in the boiler room warning you of the hazards of asbestos? A. No."); *id.* at 28:2–5 ("Q. At any time when you were serving on the U.S.S. Foss, did anybody ever tell you to wear a mask or respirator when working with asbestos dust? A. No."); *id.* at 30:17–20 ("Q. While serving on the U.S.S. Foss, did you have any idea that asbestos could be hazardous to your health? A. No."). Accordingly, there is sufficient evidence from which a reasonable jury could conclude that Foster Wheeler had no reason to believe that Navy sailors, such as the decedent, would realize the dangers associated with using its boilers.

In sum, there is a genuine dispute of material fact with respect to each element of the *DeVries* test. Accordingly, the court declines to grant summary judgment in Foster Wheeler's favor on the basis that it had no duty to warn under *DeVries*.

## III.     Whether Foster Wheeler is Protected by the Government Contractor Defense

Foster Wheeler asserts that it is entitled to summary judgment because, under the government contractor defense, it is immune from liability for its alleged failure to warn. The Supreme Court first articulated the government contractor defense in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512 (1988), holding that "[l]iability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Although *Boyle* considered the government contractor defense in the context of liability for design defects, federal circuit courts have subsequently concluded that the

defense also applies in cases involving alleged failures to warn in violation of state law. *See, e.g.*, *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 256 (4th Cir. 2017); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 1003-04 (7th Cir. 1996); *Butler v. Ingalls Shipbuilding*, 89 F.3d 582, 586 (9th Cir. 1996); *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1157 (6th Cir. 1995); *In re Joint E. & S. Dist. N.Y. Asbestos Litig.*, 897 F.2d 626, 629–30 (2d Cir. 1990).

The circuits are split, however, with respect to what a defendant must demonstrate for the defense to apply. Specifically, the Second and Eleventh Circuits require the defendant to show that the government affirmatively prohibited a warning or warnings before a contractor may invoke the government contractor defense. *See, e.g.*, *Dorse v. Eagle-Picher Indus.*, 898 F.2d 1487, 189–90 (11th Cir. 1990) ("The defendant's exhibit of Navy Department specifications does not contain any prohibition against health warnings on the product. . . . 'The contractor could comply with both its contractual obligations and the state-prescribed duty of care.' State law cannot be displaced in this context." (internal citation omitted)); *In re Joint E. & S. Dist. N.Y.*, 897 F.2d at 630, 632 ("The contractor must show that whatever warnings accompanied a product resulted from a determination of a government official . . . and thus that the Government itself 'dictated' the content of the warnings meant to accompany the product. . . . Stripped to its essentials, the military contractor's defense under *Boyle* is to claim, 'The Government made me do it.'"); *In re Joint E. & S. Dist. Asbestos Litig.*, 715 F. Supp. 1167, 1168–69 (E.D.N.Y. 1988) ("[I]t is clear that the specification does not expressly preclude warnings. . . . By contrast [to *Boyle*], in this case, because the federal specifications were silent on the matter of warnings, defendant could have provided adequate warnings to plaintiffs and complied with the federal specifications.").

In contrast, the Fourth, Fifth, Sixth, Seventh, and Ninth Circuits do not require the defendant to demonstrate that the government rejected or prohibited a particular warning or

warnings to obtain the protection of the government contractor defense. Rather, in those circuits, the defendant must only demonstrate that the government exercised discretion in approving the warnings (or lack thereof) and did not simply rubber stamp the contractor's choice for the defense to apply. *See, e.g.*, *Sawyer*, 860 F.3d at 256 ("Under this formulation, which we also now adopt, the government need not prohibit the contractor from providing additional warnings; the defense applies so long as the government dictated or approved the warnings that the contractor actually provided."); *Getz v. Boeing Co.*, 654 F.3d 852, 867 (9th Cir. 2011) ("We are not persuaded by Plaintiffs' suggestion that our decisions in *Butler* and *Hawaii Federal Asbestos* limit the defense to cases in which the government specifically forbids warnings altogether or to instances where the government explicitly dictates the content of the warnings adopted. . . . To read these cases as limiting preemption to those instances where the government forbids additional warning or dictates the precise contents of a warning would be inconsistent with the Court's decision in *Boyle*."); *Kerstetter v. Pac. Sci. Co.*, 210 F.3d 431, 438 (5th Cir. 2000) ("State law is displaced if (1) the United States exercised discretion and approved the warnings; (2) the contractor provided a warning that conformed to the approved warnings; and (3) contractor warned about dangers it knew, but the government did not."); *Tate v. Boeing Helicopters*, 140 F.3d 654, 656–57 (6th Cir. 1998) ("When state law would otherwise impose liability for a failure to warn of dangers in using military equipment, that law is displaced if the contractor can show: (1) the United States exercised its discretion and approved the warnings, if any; (2) the contractor provided warnings that conformed to the approved warnings; and (3) the contractor warned the United States of the dangers in the equipment's use about which the contractor knew, but the United States did not. . . . [T]he exercise of the government's discretion must transcend rubber stamping." (internal citation and quotation marks omitted)); *Oliver*, 96 F.3d at 1003–04 (articulating the same standard and also

18

noting that, "[w]ith respect to the first of these factors, the government's approval must, as in the case of product design matters, go beyond merely 'rubber stamping' the contractor's choice. If the government chooses its own warnings, the contractor has certainly fulfilled this first condition.").

Although the Tenth Circuit has yet to take a position on this circuit split, the court need not decide at this time whether a defendant must demonstrate that the government affirmatively prohibited the relevant warning or warnings for the defense to apply. Specifically, even when the court applies the less demanding standard here, the court still finds that summary judgment in favor of Foster Wheeler based on the government contractor defense is inappropriate. In particular, there is a genuine dispute of material fact regarding whether the government exercised any discretion beyond mere rubber stamping when it approved the absence of any asbestos warnings in connection with Foster Wheeler's boilers. *See Boyle*, 487 U.S. at 514 ("[W]hether the facts establish the conditions for the [government contractor] defense is a question for the jury."); *In re Joint E. & S. Dist. N.Y.*, 897 F.2d at 633–34 ("If the district court finds that these materials establish a genuine issue of material fact pertaining to the Government's control over the product warnings accompanying Eagle-Picher's product, as well as finding a genuine issue of material fact for each of the remaining two elements of the *Boyle* standard, it becomes the jury's task to determine whether the military contractor defense applies in this case."); *Hall v. Raytheon Aircraft*, Nos. 1:00-CV-798, 1:01-CV-221, 2002 U.S. Dist. LEXIS 9219, at *9 (W.D. Mich. May 15, 2002) ("Because the government contractor defense is an affirmative defense the defendant has the burden of establishing it. Whether the facts establish the conditions for the defense is generally a question for the jury." (internal citation omitted)).

Specifically, in its attempt to establish that the government contractor defense applies here, Foster Wheeler relies on an affidavit from John Padgett, a retired Rear Admiral of the United States

Navy, and the Military Specifications for Boilers from November 17, 1956. *See* ECF No. 183 at 22; ECF No. 183-5; ECF No. 183-6; ECF No. 204 at 10–11. Although Foster Wheeler asserts that this evidence establishes that "[t]he Navy did not simply rubber stamp Foster Wheeler's technical manuals" and that "[t]he approval of the technical manuals underwent an extensive back and forth review process," the court is not convinced. *See* ECF No. 183 at 22. In particular, although Padgett testified that "the warnings and other written materials, if any, to be furnished by Navy equipment suppliers in relation to such work . . . are subject to the Navy's supervision and control," ECF No. 183-5 ¶ 68, there is no evidence that the Navy *exercised* such supervision and control with respect to the warnings—or lack thereof—that accompanied the Foster Wheeler boilers. There is certainly no evidence that there was an "extensive back and forth review process" between Foster Wheeler and the Navy.

In addition, Foster Wheeler appears to contend that the Navy sufficiently exercised its discretion by developing detailed military specifications regarding warnings. *See* ECF No. 183 at 22 ("In the instant case, the Navy, through military specifications, determined the scope of the permissible warnings, thereby limiting the information and warnings that a manufacturer could place on their equipment and include in their technical manuals."). But Padgett testified that "the Navy's MilSpec for equipment manuals (MIL-M-15071) did not, prior to 1957, prescribe any consultant contractor-provided written warnings," *id.* ¶ 70. Similarly, the Military Specification for Boilers to which Foster Wheeler cites appears to be silent with respect to warnings. *See generally* ECF No. 183-6. Accordingly, a reasonable inference from this evidence is that the Navy paid little attention to warnings during the relevant time period and merely rubber stamped contractors' decisions to include or omit certain warnings. Indeed, Hipwell has produced evidence that contractors were involved in identifying the "special hazards" associated with their equipment

and were required by the Navy to provide a safety notice regarding such hazards in the instruction books for the equipment. *See* ECF No. 202-25 § 3.3.1.1(a). Thus, a reasonable inference is that the Navy merely rubber stamped Foster Wheeler's decision to omit any warnings regarding asbestos.

That said, another reasonable inference from this evidence is that the Navy did not prescribe any specific warnings because it either did not want to include warnings on the equipment or in the technical manuals or, once the contractor identified "special hazards," the Navy would review those hazards and determine which of them warranted written warnings. *See* ECF No. 183-5 ¶ 20 ("[T]he Navy's control extended to the warnings and/or other written materials to be supplied with [naval] equipment."); *id.* ¶ 80 ("[B]ased on my knowledge and experience, absent express direction and approval by the Navy, Foster Wheeler was not expected to provide, and could not have provided, verbal or written asbestos-related warnings to Navy sailors or Naval shipyard personnel or employees working in or on commissioned Navy ships."). In that case, if the Navy acted in that manner with respect to the warnings accompanying Foster Wheeler's boilers, the Navy may have exercised sufficient discretion for Foster Wheeler to gain the protection of the government contractor defense here. But, because there is a genuine dispute regarding the extent to which the Navy exercised discretion with respect to the warnings that accompanied Foster Wheeler's boilers, the court declines to grant summary judgment in Foster Wheeler's favor on the basis of the government contractor defense.

## IV.    Whether Foster Wheeler's Alleged Failure to Warn Caused the Decedent's Alleged Injuries

Foster Wheeler asserts that it is entitled to summary judgment because "[t]here is no proof that any warning Foster Wheeler could have put on the boilers installed on the *USS Foss* would have prevented Mr. Hipwell's injury." ECF No. 183 at 25. Specifically, according to Foster Wheeler, "[t]he Navy warned its sailors" about the dangers of asbestos and, thus, any warnings

provided by Foster Wheeler "would not [have] [told] the plaintiff anything new." *Id.* Foster Wheeler further argues that "there is no evidence that Mr. Hipwell saw any manuals or specifications pertaining to the Foster Wheeler boilers aboard the *USS Foss*, and therefore could not have seen any warnings regarding the health hazards of asbestos that may have been provided therein." *Id.* at 26. Foster Wheeler also contends that "the Navy controlled every piece of equipment and everything that sailors such as Mr. Hipwell did on the ship" and, therefore, "plaintiff cannot show that any warning from Foster Wheeler regarding the health hazards of asbestos would have caused Mr. Hipwell to alter his own conduct in a way that would have prevented his alleged injuries." *Id.*

Hipwell responds that "there is no testimony or evidence that Mr. Hipwell or Mr. Burch had knowledge of the hazards of asbestos" or "observed [and] ignored warnings from Foster-Wheeler [sic]." ECF No. 202 at 34–35. Hipwell further argues that Foster Wheeler's argument "that Mr. Hipwell would not have followed a warning, that it did not provide, is one that Foster Wheeler can make to a jury, but [there] is at best conflicting evidence and is thus not a proper basis for summary judgment." *Id.* at 35. Hipwell also asserts that "there is no evidence that the Navy did or would have ordered [the decedent] not to follow any warning, let alone any warnings related to Foster Wheeler boilers." *Id.*

"In analyzing a maritime tort case, [courts] rely on general principles of negligence law." *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980). Accordingly, "[i]n any failure to warn claim, a plaintiff must show that the failure to give an adequate warning in fact caused the injury; i.e., that had warnings been provided, the injured party would have altered his use of the product or taken added precautions to avoid the injury." *Tingey v. Radionics*, 193 F. App'x 747, 759 (10th Cir. 2006) (unpublished) (citation omitted). However, under Utah law, which

supplements federal maritime law, *see In re Aramark Sports & Entm't Servs., LLC*, 831 F.3d 1264, 1279 (10th Cir. 2016) ("'Absent a relevant statute, the general maritime law [is] developed by the judiciary.' . . . In developing maritime law, 'courts sitting in admiralty may draw guidance from, *inter alia*, the extensive body of state law . . . and from treatises and other scholarly sources.'" (citations omitted)); *Guarascio v. Drake Assocs. Inc.*, 582 F. Supp. 2d 459, 462 (S.D.N.Y. 2008) ("Where maritime law is silent, state law supplements the maritime law."), there is a heeding presumption, *see House v. Armour of Am., Inc.*, 929 P.2d 340, 347 (Utah 1996). That is, "in cases in which it cannot be demonstrated what the plaintiff would have done had he or she been adequately warned, the plaintiff should be afforded a rebuttable presumption that he or she would have followed an adequate warning had one been provided." *Id.* (citation omitted). "This rebuttable presumption shifts the plaintiff's burden on causation and allows the trial court to instruct the jury that, had an adequate warning been given, a reasonable consumer or user would have read and heeded the warning." *House v. Armour of Am., Inc.*, 886 P.2d 542, 552 (Utah Ct. App. 1994).

Here, Foster Wheeler has failed to establish that, had it adequately warned the decedent, the decedent would not have heeded the warning. Specifically, although Foster Wheeler asserts that the Navy warned the decedent about the dangers of asbestos and cites evidence suggesting that the Navy had safety procedures in place, *see* ECF No. 204-1 at 138:1–6, there is also conflicting evidence suggesting that the decedent was never warned by the Navy about the hazards of asbestos. In particular, Burch testified that, while working on Foster Wheeler's boilers, he never saw any warnings regarding the hazards of asbestos, was never told to wear a mask or respirator, and did not have any idea that asbestos could be hazardous to his health. *See* ECF No. 202-3 at 24:2–10, 28:2–5, 30:17–20. When viewed in the light most favorable to Hipwell, *see Est. of Booker*, 745 F.3d at 411, the reasonable inference is that, similar to Burch, the decedent was not

warned by the Navy about the hazards of asbestos and, consequently, did not know that asbestos could be harmful to his health. As a result, this evidence does not establish that the decedent previously ignored warnings regarding the dangers of asbestos.

Similarly, although Foster Wheeler asserts that there is no evidence that "Mr. Hipwell saw any manuals or specifications pertaining to the Foster Wheeler boilers aboard the *USS Foss*," ECF No. 183 at 26, there is also no evidence that the decedent *did not* review the manuals or specifications pertaining to the boilers. In addition, it is likely that Foster Wheeler could have placed an asbestos warning on the boilers themselves, in which case the decedent would have been warned even without examining any written manuals or specifications.

Moreover, Foster Wheeler has presented no evidence that, if it had adequately warned the decedent regarding the dangers of asbestos and the decedent had wished to wear a mask or respirator while working in response, the Navy would have prevented him. Therefore, "what the plaintiff would have done had he . . . been adequately warned" is an open question. *See House*, 929 P.2d at 347 (citation omitted). Indeed, there is some evidence that the decedent would have heeded a warning from Foster Wheeler regarding the dangers of asbestos. Specifically, Burch testified that the decedent quit smoking after he got out of the Navy, suggesting that the decedent had some level of concern regarding his health and took affirmative steps to further his health and wellbeing.[5] *See* ECF No. 202-3 at 95:22–97:3. Accordingly, there is a genuine issue of material fact regarding whether Foster Wheeler's alleged failure to warn caused the decedent's alleged injuries. Thus, the court declines to grant summary judgment in favor of Foster Wheeler on the

---

[5] Accordingly, even if the court were to supplement federal maritime law with California law, which does not recognize a heeding presumption, *see Huitt v. S. Cal. Gas Co.*, 188 Cal. App. 4th 1586, 1603 (Cal. Ct. App. 2010), the court would still conclude that Hipwell has produced sufficient evidence that the decedent would have heeded an adequate warning to defeat summary judgment.

basis that Hipwell has failed to produce sufficient evidence of causation. *See In re Flint Water Cases*, No. 17-10164, 2022 U.S. Dist. LEXIS 5300, at *51 (E.D. Mich. Jan. 10, 2022) ("[C]ausation issues in failure to warn cases should be presented to a jury unless the 'uncontroverted facts . . . make the issue so clear that all reasonable persons must agree on the proper outcome.' That rule makes sense. The causation inquiry in a failure to warn case relies on answers to 'essentially unknowable' hypotheticals. Accordingly, it is 'especially suitable for the jury.'" (internal citations omitted and cleaned up)).

## CONCLUSION AND ORDER

For the foregoing reasons, the court DENIES Foster Wheeler's motion for summary judgment (ECF No. 183).

DATED August 31, 2022.

BY THE COURT

Jill N. Parrish

United States District Court Judge